IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

Vienna Metro LLC,                          )
                                           )
            Plaintiff,                     )
                                           )
v.                                         )          CIVIL ACTION NO. 1:10cv502
                                           )
Pulte Home Corporation,                    )
                                           )
            Defendant.                     )

## MEMORANDUM OPINION AND FINAL JUDGMENT ORDER

THIS MATTER is before the Court on the Parties' non-jury trial regarding specific

performance. This case concerns the stagnation of a construction project that was to be

completed in 2007, and the Parties' inability to resolve any dispute without the intervention of an

arbiter.

There is one issue before the Court. The issue is whether Plaintiff Vienna Metro LLC

("Vienna Metro") is entitled to specific performance from Defendant Pulte Home Corporation

("Pulte") when (1) Vienna Metro cannot recover monetary damages, and (2) Pulte materially

breached its contract with Vienna Metro. The Court holds that Vienna Metro is entitled to

specific performance because (1) there is no adequate remedy at law, (2) the Parties contracted

for this remedy, and (3) the balance of equities weigh in its favor. This issue is discussed below.

## I.  PROCEDURAL HISTORY

On May 14, 2010, Plaintiff filed suit in the United States District Court for the Eastern

District of Virginia. In addition to a claim for specific performance, Plaintiff alleged that Pulte

breached the Parties' contract, and that it was entitled to monetary damages for real estate taxes,

loan interest, and lost return on equity investment. Alternatively, Plaintiff sought money damages for default interest and wasted costs.

On February 11, 2011, the Parties filed cross motions for summary judgment. On March 29, 2011, the Court granted Plaintiff's motion for partial summary judgment, determining that (1) Pulte materially breached the contract, and (2) Pulte's affirmative defenses to breach of contract fail as a matter of law. The Court further granted in part Defendant's motion for summary judgment, holding that Vienna Metro could not recover in breach of contract because it could not prove damages.

In its ruling, the Court held that Vienna Metro has no adequate remedy at law for breach of contract. The Court concluded that "[t]he Declaration is a valid, enforceable written contract that defines the scope and deadlines for completion of Pulte's Work, and [that] Pulte materially breached the [Declaration] by not completing the work." *See Vienna Metro LLC v. Pulte Home Corp.*, 1:10cv502, Dkt. No. 135 at 7 (E.D. Va. Mar. 29, 2011) (hereinafter "Mem. Order"); *see also Horton v. Horton*, 487 S.E.2d 200, 204 (Va. 1997) (holding that a material breach is a failure to comply with a fundamental aspect of the contract, so that the "failure to perform that obligation defeats an essential purpose of the contract").

The Court explicated that (1) "it is undisputed that the dates initially set in the Declaration have passed, and that the work set forth in the Declaration is incomplete"; "[t]he Declaration prefaces each aspect of Pulte's [W]ork by a time period of not greater than eighteen months after the [E]ffective [D]ate"; and (3) "Pulte admits that it failed to complete all of its work within eighteen months after the [E]ffective [D]ate." Mem. Order at 5.

The Court further explained that the Declaration makes timely performance of Pulte's Work a fundamental aspect of the contract. In particular, "the Declaration requires timely

completion of each construction phase, as exhibited by the 'shall' language of the contract." *Id.* Additionally, the Court ruled that "[t]he Declaration provides timeliness provisions in over fifteen clauses, unequivocally stating that [Pulte] is to complete its construction responsibilities within a given timeframe." *Id.* at 9. Pulte materially breached the Declaration by "frustrat[ing] the [Declaration's] essential purpose of building infrastructure by violating the Declaration's express timeliness provision, [Section] 1.18," and "by not completing all phases of the construction by [the deadlines]." *Id.* at 7, 8. Accordingly, the Court ruled that specific performance was an appropriate remedy.

On May 2, 2011, the Court began a four-day bench trial. The Court's findings follow.

## II. STANDARD OF REVIEW

In a non-jury case, the court must make specific findings of fact and separately state its conclusions of law. Fed. R. Civ. P. 52(a)(1). The trial judge has a function of finding the facts, weighing the evidence, and choosing from among conflicting inferences and conclusions those which he considers most reasonable. *Penn-Texas Corp. v. Morse*, 242 F.2d 243, 247 (7th Cir. 1957) (quotation marks and citations omitted). The trial judge has the inherent right to disregard testimony of any witness when satisfied that the witness is not telling the truth, or testimony is inherently improbable due to inaccuracy, uncertainty, interest, or bias. *Penn-Texas Corp.*, 242 F.2d at 247 (quotation marks and citations omitted); *see Columbus-America Discovery Group v. Atl. Mut. Ins. Co.*, 56 F.3d 556, 567 (4th Cir. 1995) (stating that that factfinder is in a better position to make judgments about the reliability of some forms of evidence, including evaluation of the credibility of witnesses) (quotation marks and citations omitted). It is the duty of a trial judge sitting without a jury to appraise testimony and demeanor of witnesses. *See Burgess v. Farrell Lines, Inc.*, 335 F.2d 885 (4th Cir. 1964). To satisfy the demands of Rule 52(a), a trial

court must do more than announce statements of ultimate fact. *United States ex rel. Belcon, Inc. v. Sherman Const. Co.*, 800 F.2d 1321, 1324 (4th Cir. 1986) (citation omitted). The court must support its rulings by spelling out the subordinate facts on which it relies. *Id.*

> The language of Rule 52 has been construed

> not to require a court to make findings on all facts presented or to make detailed evidentiary findings; if the findings are sufficient to support the ultimate conclusion of the court they are sufficient. Nor is it necessary that the trial court make findings asserting the negative of each issue of fact raised. It is sufficient if the special affirmative facts found by the court, construed as a whole, negative each rejected contention. The ultimate test as to the adequacy of the findings will always be whether they are sufficiently comprehensive and pertinent to the issues to provide a basis for decision and whether they are supported by the evidence.

*Darter v. Greenville Cmty. Hotel Corp.*, 301 F.2d 70, 75 (4th Cir. 1962). This rule does not require that the trial court set out findings on all the myriad factual questions that arise in a case. *Golf City, Inc. v. Wilson Sporting Goods, Co., Inc.*, 555 F.2d 426, 433 (5th Cir. 1977). The sufficiency of findings of fact depends upon the particular facts of each individual case, and no general rule can govern. *Darter*, 301 F.2d at 75.

### III. FINDINGS OF FACT

1. This case concerns the Defendant Pulte's failure to timely construct a construction project, and their inability to abide to the terms of a contract to which they agreed in 2007.

2. Vienna Metro is a Virginia limited liability company. Vienna Metro is single-purpose-entity affiliate of Clark Realty Capital ("Clark"), a national real estate company. *See* June 21, 2006 Declaration of Covenants, Conditions, Easements and Restriction at 1 ("Declaration") (PX-1); Pulte's Amended Answer to Counts I & II of the Complaint ¶ 4 [Dkt. 43]. Pulte is a Michigan Corporation and a sophisticated national homebuilder. *See* Amended Answer ¶ 5; Mem. Order at 4.

3. MetroWest "is a fifty-six acre tract of land located adjacent to the Vienna Metro

4

station in Fairfax County, Virginia. Vienna Metro owns approximately 9.8 acres of MetroWest, while Pulte owns the remainder." Mem. Order at 4.[1]

4.      On June 21, 2006, Vienna Metro purchased the Clark Property from Pulte and, contemporaneous with the purchase, Vienna Metro and Pulte executed a Declaration of Covenants, Conditions, Easements and Restrictions, which sets forth the parties' contractual obligations in developing MetroWest. *See* Mem. Order at 4; Declaration.

5.      Once developed, MetroWest will be a new transit-oriented, mixed-use community that incorporates a variety of townhomes, condominiums, apartments, convenience retail, commercial office, and public spaces. MetroWest will include a new, pedestrian-friendly interface with the Metro Station, a town center plaza combining retail and public outdoor activity space, pedestrian connections to East Blake Lane Park, and a new recreation/community center to be dedicated to the County. *See* March 27, 2006 MetroWest Conceptual Final Development Plan RZ-2003-PR-022 (PX-23); March 21, 2006 MetroWest Proffers RZ-2003-PR-022 (PX-22).

6.      The Clark Property is adjacent to and abuts the Pulte Property. *See* Map of MetroWest (PX-545). Vienna Metro purchased the Clark Property from Pulte in an ungraded, unimproved condition, without roads, utilities, or grading necessary for commercial development of the Clark Property in accordance with the Proffers. *See generally* Declaration; MetroWest Proffers. The Clark Property is landlocked with no access to Route 29, Saintsbury Drive, or the other roads that adjoin the Project Property. *See* Map of MetroWest (PX-544). Temporary access easements across the Pulte Property are the only current means providing paved vehicular access to the Clark Property. *See* Declaration § 3.2, Ex. D § 3(f).

---

[1] Under the Declaration, Vienna Metro's portion of the property is referred to as the "Clark Property;" Pulte's portion of the property is referred to as the "Pulte Property;" and collectively, the two are referred to as the "Project Property." Declaration at R-1. Similarly, the Declaration, the Parties, and documents often refer to Vienna Metro as "Clark." *Id.* at 1.

7. The Declaration provides that Pulte is obligated to design, permit, bond, and put into service for Vienna Metro's use: (i) the Required Roads Phase I; (ii) the Wet Utilities; and (iii) the Stormwater Vaults. *See* Declaration Ex. D §§ 3(a), 3(b)(i), 3(c), 3(g), 3(h), 3(i). The Declaration also provides that Pulte is to prepare an Overall Grading Plan for the Project Property and permit, bond, and perform (or cause to be performed) all work shown on the grading plan. *See id.* at Ex. D §§ 3(e), 3(j)(1). These obligations, among others, constitute "Pulte's Work," as that term is defined in the Declaration. *See id.* at Ex. D § 3.

8. Exhibit D to the Declaration also sets forth the parties' cost sharing for Pulte's Work. In particular, Section 4(a), entitled "Clark's Share of Project Costs," provides that Clark's Share of the Project Cost for Pulte's work is 17.54% "of the actual, reasonable third party costs for that part of Pulte's Work arising out of construction of the Required Roads, trunk Utility lines, and Stormwater Vaults, provided all of the foregoing work has been performed strictly in accordance with the plans, specifications and budget(s), and performed by the contractors, approved by Clark." *Id.* at Ex. D § 4(a).

9. Because the Clark Property is effectively landlocked, without direct access to Lee Highway or any of the other surrounding public roads, Pulte is also obligated to "maintain and provide continuous construction and public paved vehicular access … to and from the Clark Property … to Lee Highway" under Section 3.2.2 of the Declaration. *Id.* at § 3.2.2.

10. "The Declaration obligated Pulte to perform certain infrastructure design, permitting, and construction work over the entire project site within eighteen months of the Declaration's execution." Mem. Order at 4. Specifically, Exhibit D, Section 3 sets forth completion dates for each element of Pulte's Work, as well as interim dates by which the work must be designed, permitted, and bonded. The Declaration provides that Pulte's Work had to be

6

designed, permitted, and bonded within 12 months after the Declaration's Effective Date and placed in service for Vienna Metro's use within 18 months after the Effective Date. *See* Declaration Ex. D.

11.    The Declaration's Effective Date is June 21, 2006. *See* Declaration at 20; Mem. Order at 8.  The 12-month and 18-month periods specified in Exhibit D, Section 3 of the Declaration expired on June 21, 2007 and December 21, 2007, respectively.

12.    "[T]he Declaration feature[s] one express timeliness provision for the entire contract ...." Mem. Order at 5; *see* Declaration. § 1.18 ("Time is of the essence/weekends and holidays.  Time is of the essence for every provision of this agreement.").  "The Declaration [also] provides timeliness provisions in over fifteen clauses, unequivocally stating that [Pulte] is to complete its construction responsibilities within a given timeframe." Mem. Order at 9; *see, e.g.,* Declaration § 2.4.1, Ex. D § 3.

13.    Section 1.11 of the Declaration, entitled "Force Majeure," permits an extension of a deadline for the performance of certain obligations in the Declaration, including for "acts of god, unusual governmental delays, restrictions or moratoria, strikes, war, civil unrest, rioting, unavailability of labor or materials and despite reasonable diligence, unusually inclement weather." Mem. Order at 8; Declaration § 1.11.  The Declaration's Force Majeure provision states that no extension "shall exceed ... three hundred sixty (360) days in the aggregate for any one Party's obligations ...." Declaration § 1.11; *see* Mem. Order at 8.  Under the maximum allowable Force Majeure extension, Pulte's Work must have been completed on or before December 15, 2008.

14.    "It is undisputed that the dates initially set in the Declaration [for Pulte's Work] have passed, and that [Pulte's Work] is incomplete." Mem. Order at 5.  Both as of December 21,

2007 and to date, Pulte has not: (i) constructed and placed the Required Roads Phase I into service for vehicular use; (ii) constructed, brought to the Clark Property line, and made the Wet Utilities available for Vienna Metro's use; (iii) constructed and made the Stormwater Vaults available for Vienna Metro's use; or (iv) performed all work shown on the Overall Grading Plan.

15.     Section 5.1.1 provides that "[i]f any party defaults ... in the performance of any of its ... obligations ... and fails to cure such default within thirty (30) days after written notice (a 'Default Notice') from the [Non-Defaulting Party], then the Non-Defaulting Party ... shall be entitled to all the remedies that are available at law or in equity, including, without limitation, specific performance ...." Declaration § 5.1.1; *see* Mem. Order at 10.   Section 5.1.1 also provides that "[e]ach Party shall be responsible hereunder for the defaults of their respective agents, contractors, employees and representatives." Declaration § 5.1.1.

16.     "In December 2007[,] January 2008, [and April 2010,] Vienna Metro sent Pulte [D]efault [N]otices for failing to complete its required work by the appropriate date." Mem. Order at 5; *see* Dec. 3, 2007 Vienna Metro's 1st Default Notice to Pulte [Dkt. 1-8] (PX-4); Jan. 17, 2008 Vienna Metro's 2nd Default Notice to Pulte [Dkt. 1-9] (PX-7); April 19, 2010 Vienna Metro's 3rd Default Notice to Pulte (PX-9).

17.     In April 2011, Vienna Metro sent Pulte a fourth Default Notice for failing to maintain continuous paved vehicular access to and from the Clark Property over the Access Easement, as well as for removing the then-existing paved access to the Clark Property without providing alternate based paved access, required under Section 3.2.2 of the Declaration. *See* March 8, 2011 Vienna Metro's 4th Default Notice to Pulte (PX-437).

18.     In April 2008, Pulte refused to commence its construction obligations unless it "receive[d] (i) evidence of a lease commitment regarding the timing [of a prospective Clark

8

Property tenant]; and (ii) some security to protect [Pulte] in the event [the Clark Property] tenant fails to take possession as promised." April 28, 2008 Letter S. Settle to C. Guidi (PX-32).

19.     In October 2008, Pulte obtained the necessary approvals and work permits from Fairfax County to begin construction of Vaden Drive. Sept. 13, 2010 Pulte's 1st Supp. Resps. to Vienna Metro's Interrogs. at Resp. 2 (PX-153). The Vaden Drive approval permitted Pulte to clear, grade, and balance the entire site, as well as to construct Vaden Drive, which is the main artery through the Project Property. *See* Dec. 4, 2008 Email R. Seminoff to T. Stewart (PX-79).

20.     In December 2008, Pulte started initial construction activities on the site, but then suspended all construction activities in early 2009. *See* Dec. 4, 2008 Email R. Seminoff to T. Stewart; Pulte 1st Supp. Resps. to Vienna Metro's 1st Interrogs. at Resp. 4.

21.     In September 2010, Pulte submitted sworn testimony that "intend[ed] to proceed as expeditiously as reasonably possible, without cessation of activities for reasons within its control, through the Vaden Drive Plan, the Section 2 plan and the Saintsbury Drive plan, with all such work to be substantially completed no later than the end of 2011." Sept. 7, 2010, Pulte's Resps. to Vienna Metro's 1st Set of Interrogs. at Resp. 5 (PX-88).

22.     In early 2011, Pulte began advertising MetroWest and its luxury townhomes for sale "Coming Spring 2011." April 2011 Washingtonian Advertisement (PX-600); *see* Pulte MetroWest Brochure (PX-601).

23.     Exhibit D, Section 3(k) (entitled "Plans, Specifications, Budget and Schedule") provides that "[f]or each phase of Pulte's obligations of the Post Close Obligations … Pulte shall, prior to commencing any work, submit to Clark for its written approval the relevant development and concept plans, plans and specifications, engineering designs and plans, bids submitted by third party contractors and suppliers, completion schedule for such work, and

detailed line-item budgets therefore," as well as "any changes to any of the foregoing submissions." Declaration Ex. D § 3(k). Additionally, Pulte "shall … competitively bid to multiple contractors" for "[a]ll work" in order to "minimize cost." *Id.*

24.     In April 2010, Pulte started site work at the MetroWest project site. Pulte commenced this site work, which included mass grading on the Clark Property, without a budget, schedule, plan, or bids approved by Vienna Metro. *See* Vienna Metro's 3rd Default Notice to Pulte. Similarly, in October 2010, Pulte awarded a utility contract to a contractor, and has since commenced utility work for the project, without a budget, schedule, plan, or bids approved by Vienna Metro. *See* Oct. 22, 2010 Letter J. Edelman to J. Sotos (PX-94); April 21, 2011 Video of MetroWest (PX-605).

25.     Section 2.5.1 provides that "[e]ach party will keep the other fully informed of its progress with respect to its obligations in the Declaration." Declaration § 2.5.1.

26.     In July 2010, Vienna Metro wrote to Pulte asking questions about the scope of the site work that Pulte and its contractor was then performing on the Clark Property, the safeguards that Pulte and its contractor had put in place to protect Vienna Metro's Access Easement, and the approved plans, specifications, and schedules pursuant to which the work was being undertaken. July 29, 2010 Letter T. Clare to P. Kaplan (PX-308). Receiving no response for more than a month, Vienna Metro inquired again in August 2010. *See* Aug. 31, 2010 Letter T. Clare to P. Kaplan (PX-482). To date, Pulte has not responded to these questions regarding the work being performed on the Clark Property.

27.     Section 2.1, entitled "Use Restriction on the Project Property," states that "[t]he Pulte Property shall be limited to for-sale housing, supporting retail and/or supporting office uses and no portion of the Pulte Property shall be permitted to have multi-family rental uses."

Declaration § 2.1.1. The Declaration provides in Section 2.1.3 that this provision "shall expire upon ... the fifth (5th) anniversary of the Effective Date." *Id.* at § 2.1.3. Section 2.1.1 is therefore set to expire on June 21, 2011.

28.     Had Pulte timely completed Pulte's Work as required by the Declaration (*i.e.* "[w]ithin eighteen (18) months after the [June 21, 2006] Effective Date"), Vienna Metro would have had a 42 month exclusivity period, from December 21, 2007 through June 21, 2011, to develop and use the Clark Property for multi-family rental uses.

29.     This Court previously concluded that "[t]he Declaration is a valid, enforceable written contract that defines the scope and deadlines for completion of Pulte's Work, and [that] Pulte materially breached the [Declaration] by not completing the work." Mem. Order at 7; *see Horton v. Horton*, 487 S.E.2d 200, 204 (Va. 1997) (holding that a material breach is a failure to comply with a fundamental aspect of the contract, so that the "failure to perform that obligation defeats an essential purpose of the contract").

30.     Here, "it is undisputed that the dates initially set in the Declaration have passed, and that the work set forth in the Declaration is incomplete." Mem. Order at 5. "The Declaration prefaces each aspect of Pulte's [W]ork by a time period of not greater than eighteen months after the [E]ffective [D]ate." *Id.* "Pulte admits that it failed to complete all of its work within eighteen months after the [E]ffective [D]ate." *Id.*

31.     The Declaration makes timely performance of Pulte's Work a fundamental aspect of the contract. In particular, "the Declaration requires timely completion of each construction phase, as exhibited by the 'shall' language of the contract." *Id.* Additionally, "[t]he Declaration provides timeliness provisions in over fifteen clauses, unequivocally stating that [Pulte] is to complete its construction responsibilities within a given timeframe." *Id.* at 9. Pulte materially

breached the Declaration by "frustrat[ing] the [Declaration's] essential purpose of building infrastructure by violating the Declaration's express timeliness provision, [Section] 1.18," and "by not completing all phases of the construction by [the deadlines]." *Id.* at 7, 8.

32.　　On May 2, 2011, the Court conducted a four-day non-jury trial.

33.　　During trial, Mr. George James Sotos testified on behalf of Plaintiff Vienna Metro. Mr. Sotos is the current Managing Director for Clark Realty Capital, which requires him to oversee zoning, implement utilities, and ensure proper titling of this project. Mr. Sotos has worked for Clark since 1999, and oversaw two large projects prior to MetroWest.

34.　　Mr. Sotos currently lives in Fairfax. He attended Dartmouth College, and obtained a Masters in Business Administration from the University of Virginia. Prior to coming to Clark, he worked for Arthur Andersen, LLP. He also owns a two-percent interest in the Vienna Metro project.

35.　　Mr. Sotos appeared to be a credible witness who was knowledgeable regarding all the workings of MetroWest.

36.　　Mr. Sotos explained that Vaden Drive was to be "in service," meaning both publicly available and in working condition, within eighteen months of the Execution Date, but was not in service at the time of trial.

37.　　Mr. Sotos explained that Saintsbury Drive belongs to the Washington Metropolitan Area Transit Authority ("WMATA") and is to function as the front door of Vienna Metro's property. Saintsbury Drive was to be widened to four lanes, with title of the road transferred from WMATA to the Virginia Department of Transportation ("VDOT") by this time. Mr. Sotos analogized Saintsbury Drive to Pulte's Vaden Drive—these roads are the gateways into the community.

38.     As of the date of trial, the Clark Property was still ungraded to specification, and Pulte has not constructed either wet or dry utilities. Mr. Sotos explained that Vienna Metro did not approve the road design and plan as required by the Declaration. Essentially, Mr. Sotos explained that Vienna Metro is the customer, and Pulte is the deliverer of goods and services; Vienna Metro has the power to approve the design, but does not have the ability to construct the roads itself.

39.     Mr. Sotos personally recorded video of the Clark Property. Pulte has made minimal progress on Vienna Metro's roads, utilities, and promised infrastructure. Furthermore, Pulte's requirement to solicit bids is behind schedule—the dry utility request for proposal ("RFP") was sent on August 20, 2010. This bid went to D.A. Foster, a contractor. As of April 21, 2011, D.A. Foster proceeded with construction, including digging out a trench with a conduit, which will carry the required wires for the entire development.

40.     Mr. Sotos explained that construction continues without approval of any schedule by Vienna Metro. As of October 10, 2010, Pulte completed portions of the Project without Vienna Metro's approval. Mr. Sotos explained that "it was difficult to go back in time to fix the plans as if following the Declaration," citing Vienna Metro's desire to ensure that Pulte builds the infrastructure necessary to power, water, and maintain the development for the foreseeable future.

41.     Mr. Sotos explicated that Vienna Metro approved particular revisions to the Vaden Plan. Vienna Metro was particularly interested in dry utility routing and "power diversity." As Vienna Metro will be a high-density, mixed-use property, Clark would prefer that there are two sources powering the development. Vienna Metro also desires immediate grading

because it would like to commence with its construction of the four high-rise mixed-use towers it plans to build facing the Vienna Metro Station.

42.     Mr. Sotos stated that he received a schedule for completion in April 2011, the same month trial began. Prior to this schedule, Pulte last provided a schedule in 2006. Pulte did not submit the new schedule for approval. Vienna Metro never provided a schedule because it had its "eyes looking in." Vienna Metro maintained that the new schedule needed to be challenged because the various preconditions—such as the Stormwater Vaults' completion prior to the construction of Saintsbury Drive—were unfair to Vienna Metro.

43.     Mr. Sotos articulated that he wanted assurances that Pulte's Work is completed. "Starting is not the goal, finishing is," he avowed. He further recognized that construction cost will increase as time passes. Final engineering plans were not yet complete, and both Pulte's and Vienna Metro's projects—the infrastructure construction and the 300,000 square feet of office space, four high-rise buildings, and nine hundred housing units—need to be erected.

44.     Mr. Sotos explained that Fairfax County will currently allow 599 residential use permits (RUPs), which are sufficient for Pulte to complete a majority of its housing units without providing any units for Vienna Metro. Additionally, the construction of Saintsbury Drive is predicated on reaching the issuance of 600 RUPs, which will allow Sections 1, 2, and 3 of Pulte's property to be built before the paving of Saintsbury Drive.

45.     Mr. Sotos proclaimed that Pulte's previous interrogatories estimated that the infrastructure would be completed by late 2011. This is in contrast to Pulte's most recent proposed order, which requested forty-two months to complete the project.

46.     Mr. Sotos provided additional video showing (1) a dirt wall blocking the Clark Property, (2) nothing built on the Clark Property, (3) Pulte's substantial progress on its section of the property, and (4) Pulte's sections' graded roads.

47.     Mr. Sotos suggested that the Parties agreed on an overall plan, but Pulte objected to moving the excess dirt because of the additional costs associated with moving dirt. Mr. Sotos reiterated that Vienna Metro would like to exercise its rights under the Declaration to ensure proper construction, and to avoid situations such as Pulte's mistaken destruction of Vienna Metro's access road.

48.     On cross-examination, Mr. Sotos explained that (1) the Parties have never conferred in the same room, and (2) the Parties have had extreme difficulty with agreeing on construction specifications. Mr. Sotos reiterated that the project construction design is critical because of both foreseeable and unforeseeable building requirements; Pulte cannot use materials and designs that Vienna Metro does not approve because the particular infrastructure requirements for both office and mixed-use buildings are critical.

49.     During trial, Mr. Jeff Edelman testified on behalf of Pulte. Mr. Edelman worked on the Huntington Metro project between 2004-2006 and has substantial experience with VDOT and WMATA projects. In 2009, Mr. Edelman finished his role with the Huntington Metro project and began working on MetroWest.

50.     Mr. Edelman is Pulte's Director of Land Development-Virginia. He holds all land-related responsibilities, including the issuance of permits, bonds, and letters of credit. He estimates that he spends seventy percent of his time on MetroWest. He is responsible for the grading of the property, the construction of three Stormwater Vaults: one in Section 1, one in the northeastern corner of Section 2, and one in the northwestern quadrant of Sections 5 and 6. He is

15

further responsible for dry utility installation, the trail for Vaden Drive, the park connection, and all roads—all described as Pulte's Work in the Declaration.

51.     Mr. Edelman appeared to be a credible witness who was knowledgeable regarding all the workings of MetroWest.

52.     Mr. Edelman explained the use of the Proffers, an agreement between the applicant and the County to rezone the property for a proposed use. The Proffers explain, in words, a property's purpose and plan, and the Proffers are directly tied to the Conceptual Development Plan/Final Development Plan ("CDP/FDP"). The CDP/FDP is a visual representation of the Proffers, and depicts a property's zoning boundaries, unit counts, building location, lighting landscape requirements, and various amenities.

53.     The Proffers have sequencing requirements. Mr. Edelman declared that Vaden Drive must be complete before any units are built.

54.     Mr. Edelman explicated the site plan approval process. First, a client hires an engineer that prepares civil drawings, which are then submitted to Fairfax County. Second, the drawings are then reviewed for comments by Fairfax County and outside agencies, including VDOT, WMATA, the Fairfax County Fire Marshal, Fairfax County Sanitation, and Falls Church Water, the area's water management utility company. Third, following the review, the engineer and the client review the comments. Fourth, a post-submission conference is held with the county and outside agencies, which entails a line-by-line review of necessary changes. Fifth, after the changes are made, the client will likely get approval from the county and outside agencies. Sixth, the engineer would then re-submit the revised drawings. Seventh, the county will hopefully approve the drawings. However, in some cases, the county may twice reject the drawings, and the process must restart with the third step. If this does not occur, the eighth step

requires that the plan is then sent to bonds and agreements. Ninth, the county site permit is issued. Lastly, the county site inspector then examines the plan, and the project moves to the how-to phase, and construction commences.

55. Mr. Edelman explained that Section 1 is fully complete permit-wise and that Sections 2 and 3 are complete permit-wise with construction underway. Saintsbury Drive's plan is currently at the second submission stage because a third submission was required by VDOT, the Fairfax Fire Marshal, Falls Church Water, and WMATA.

56. Mr. Edelman explained that the Vienna Metro grading is currently complete at +/- six inches, and Pulte is waiting for signatures regarding grading completion and the Stormwater Vault in Section 3. He further explained that Vienna Metro requested approval for these projects in both late 2010 and April 2011.

57. As of now, Pulte is mass-grading Saintsbury Drive. Mr. Edelman stated that heavy equipment first grades the property to +/- six inches, followed by fine grading to +/- one inch.

58. Mr. Edelman acknowledged that he completed the most recent schedule, which was finalized in early April 2011 in conjunction with contractors and experts. He suggested that completing overall grading in eighteen months would be difficult because best practices dictate that dirt is moved once to minimize costs. For example, Vienna Metro's demand for immediate grading would result in dirt being moved at least twice, at a cost of $250,000 to $400,000 for each instance. Additionally, necessary construction cannot be completed because some items—such as the Stormwater Vaults—remain unconstructed, which runs in contrast to the sequencing plan. Additionally, some of the projects have yet to be bid, and some of the permits have yet to be issued.

59.     Mr. Edelman claimed the Vaden Plan grading could be complete by early 2013. He reiterated that it could not be complete in eighteen months because (1) Vienna Metro has yet to sign a deed giving Pulte permission to complete its work, (2) county approval has not been obtained, (3) the prerequisite Stormwater Vault has not been built and filled, and (4) Pulte has not hired all the necessary contractors because Pulte must have assurances of Vienna Metro's approval. However, Mr. Edelman stressed that the third Stormwater Vault could be completed in eighteen months.

60.     Mr. Edelman further declared that it was not possible to provide Vienna Metro's desired power capacity for its buildings because the necessary power source on which to draw upon was located in Blake Lane, which is roughly a mile away.

61.     Mr. Edelman explicated that Pulte and Vienna Metro have had extreme difficulty in agreeing upon the particulars of the project: Vienna Metro has only approved three out of almost three dozen requests. For example, Vienna Metro disapproved particular grades received from Pulte that were suggested by Vienna Metro itself.    Mr. Edelman further stressed that the Umbrella Owners' Association (UOA) has yet to be established, which is required as to delegate the responsibility of Stormwater Vault maintenance. Without the UOA, the development would not have a manager of the site to maintain a uniform look and feel to this multimillion dollar project.

62.     Mr. Edelman concluded by explaining that the bid for the remainder of work by SW Rogers, a construction company, remained the same as it was in 2006. While 2011 differs from 2006 because there is less profit margin on a given project, construction requires less staff, technology has advanced, and general pricing is cheaper. Additionally, Mr. Edelman claimed that he could do no more to accelerate the project because half of his staff is working on

MetroWest. Ultimately, Pulte would like to work quickly to reduce the cost of bond maintenance.

63.     On cross-examination, Mr. Edelman conceded that (1) build times could be shortened to expedite the process, and (2) the Proffers contemplate the UOA and maintenance of the Stormwater Vaults, but the construction of the Vaults are not expressly conditioned on UOA formation

64.     During trial, Mr. Lewis Birnbaum testified on behalf of Pulte. Mr. Birnbaum is the Division President of Pulte's Mid-Atlantic Division since August 2009.

65.     Mr. Birnbaum appeared to be a credible witness who was knowledgeable regarding all the workings of MetroWest.

66.     Mr. Birnbaum stressed his worries regarding the Parties' ability to comply with the Declaration without a court order requiring dispute resolution. He maintained Pulte's desire to finish as expeditiously as possible. He further declared that Pulte could finish the Work by the commercially reasonable deadline of Spring 2013, a period of roughly twenty-two months of the date of this Opinion.

67.     During closing argument, the Parties stipulated that they wanted the Court to enter a specific performance order. In their stipulation, the Parties waived the right to appeal to the District Court and consented to a Special Master's binding, final decision on all required plans, designs, and other approvals required when the Parties cannot reach agreement consistent with the Declaration and plans.

## IV. CONCLUSIONS OF LAW

There is one issue remaining. The issue is whether Vienna Metro is entitled to specific performance. The Court holds that Vienna Metro is entitled to specific performance for three

reasons: (1) specific performance is an adequate remedy, (2) the Parties contractually agreed to this remedy, and (3) the balance of equities falls in Plaintiff's favor.

### A. Specific Performance is an Appropriate Remedy

The Court holds that specific performance is an appropriate remedy. "The decision whether to grant specific performance of a contract is a matter submitted to the sound discretion of the trial court." *Chattin v. Chattin*, 427 S.E.2d 347, 350 (Va. 1993) (citing *Griscom v. Childress,* 31 S.E.2d 309, 312 (Va. 1944)). Specific performance is an equitable remedy, which should be granted or refused under established equitable principles and the facts of a particular case. *See* Mem. Order at 19 (citing *Cangiano v. LSH Bldg. Co.,* 623 S.E.2d 889, 894 (Va. 2006)). Courts routinely grant specific performance after concluding that a defendant has breached its contractual obligations. *See, e.g., Wooten v. Lightburn*, 579 F. Supp. 2d 769, 777-79 (W.D. Va. 2008) (granting specific performance of a contract to sell real property at a specified price per acre), *aff'd*, 350 F. App'x 812 (4th Cir. 2009); *Haythe v. May*, 288 S.E.2d 487, 489 (Va. 1982) (reversing and ordering a grant of specific performance of a contract); *Thompson v. Commonwealth*, 89 S.E.2d 64, 67-69 (Va. 1955) (affirming a grant of specific performance of a contract to build voting booths). Additionally, a party "may not take advantage of its own breach of contract by leaving Plaintiff with no remedy at law or equity." Mem. Order at 8; *see Thompson*, 89 S.E.2d at 67 (specific performance may be appropriate when the remedy at law is inadequate).

Here, specific performance is appropriate based upon equitable principles and the facts of this case for five reasons. First, Vienna Metro has no remedy at law at set forth in detail in the Court's opinion on cross motions for summary judgment. *See* Mem. Order at 19-22. Second, Pulte's Work that was contractually obligated to be complete in 2007 is as of yet incomplete in

2011. Pulte has unilaterally set forth a construction plan that does not encompass meeting Vienna Metro's goals expeditiously, while favoring Pulte's own objectives to Vienna Metro's economic detriment. While MetroWest remains a construction zone, there is no definitive timeline as to when the construction will be complete. Third, Pulte is not performing its work expeditiously, and an order of specific performance will force Pulte to finish as quickly as possible. Pulte itself explained that it wanted to finish quickly, and a court order will help focus Pulte to complete the project on time and within budget. Fourth, Pulte cannot take advantage of its own breach of contract by avoiding legal damages and completing construction on its own terms. Because Pulte has begun site work on the project, self-help in the form of hiring a contractor to finish the work for MetroWest is not possible without Pulte's permission. Lastly, the Parties agree that such an order is necessary to complete construction because they cannot agree on any issues—they appear to have agreed to a contract on paper, but cannot seem to abide by its terms. Mr. Edelman explained that the approval process has bogged down, and the Parties have only reached agreement on three out of almost three dozen requests. Accordingly, the Court exercises its discretion to order specific performance because such an order will ensure the performance of a contract to which both Parties agreed.

### B. The Parties Contractually Agreed to Specific Performance

Additionally, the Court holds that specific performance is particularly appropriate because the Declaration explicitly calls for this remedy. Specific performance is particularly appropriate when contract expressly calls for specific performance to remedy a breach. *See, e.g., Hamlet v. Hayes*, 641 S.E.2d 115, 118 (Va. 2007) (concluding that specific performance is a proper remedy for breach of a contract that explicitly provided for specific performance).

Here, the contract specifically calls for specific performance. In Section 5.1.1 of the Declaration, "the Parties agreed that specific performance was a remedy for default." Mem. Order at 19. Hence, specific performance is particularly appropriate in this case.

Moreover, Pulte has conceded in pleadings and at trial that specific performance is an appropriate remedy. During the trial, both Parties pleaded for the Court to enter an order for specific performance to (1) clarify the timeline in which the project was to be completed, (2) establish clear parameters for the ultimate completion of the project, and (3) allow for an arbiter to fully and finally resolve all disputes concerning the requirements of the Declaration when the Parties do not agree. Accordingly, specific performance is particularly appropriate because of the Parties' express agreement and stipulation in open court.

## C. The Balance of Equities Weigh in Favor of Vienna Metro

The Court holds that the principles and the facts of this case warrant entry of specific performance. "Specific performance may be granted or refused under established equitable principles and the facts of a particular case . . . . with a view to the substantial justice of the case." *See Cangiano*, 623 S.E.2d at 894.

The balance of equities weigh in favor of Vienna Metro for three reasons. First, Pulte readily admits that, in 2008, after Vienna Metro had already placed Pulte in default, it made a business decision not to perform its construction obligations under the Declaration in light of the downturn in the real estate market. For example, Pulte had Vaden Drive approvals from Fairfax County in hand in October 2008, which allowed Pulte to clear, grade, and balance the entire Project Property, as well as to construct Vaden Drive, which is the main artery through MetroWest. *See* Dec. 4, 2008 Email R. Seminoff to T. Stewart. Rather than moving forward with construction, Pulte voluntarily decided to suspend construction work in order to save at

22

least $30 million. *See id.*; Pulte 1st Supp. Resps. to Vienna Metro's 1st Interrogs. at Resp. 4. Pulte balanced the unlikely prospect of closing sales on its townhomes and the significant expense of Pulte's Work against Vienna Metro's contractual rights and likelihood of invoking its remedies under the Declaration and the "huge" "cashflow savings" for the company. *See* Dec. 3, 2008 Email R. Seminoff to B. Kunec (PX-78); Dec. 4, 2008 Email R. Seminoff to T. Stewart.

Second, Pulte's power under the Declaration is extremely one-sided, and Pulte can effectively avoid construction of Vienna Metro's property. While it may be argued that Pulte bested Vienna Metro in the contractual negotiations, Pulte is able to build several sections of the property before even building Vienna Metro's infrastructure. According to testimony at trial, Pulte is not contractually obligated to begin constructing Vienna Metro's portion of the land until 599 residential use permits (RUPs) are issued. At this rate, Pulte would be able to build Sections 1, 2, and 3 of the development without construction of Vienna Metro's Section, Section 6. Given the tenuous relationship between the parties, it would be unjust for Vienna Metro to wait even longer for the construction of its infrastructure. In short, Pulte is the majority land owner and the dictator of the construction pace, and an order must be entered to ensure the completion of this project. While there is a distinct lack of focus between the Parties, Pulte has the final control over the entire project, and must not only look out for the interests of itself, but for Vienna Metro as well.

Lastly, Pulte has failed to maintain continuous paved vehicular access to and from the Clark Property over the Access Easement, and removed the existing paved access to the Clark Property without providing alternate based paved access, required under Section 3.2.2 of the Declaration. *See* March 8, 2011 Vienna Metro's 4th Default Notice to Pulte. While Pulte has

apologized for the mistaken destruction of the access road, Vienna Metro must have continuous access to ensure that its portion of the project is completed in a timely fashion.

For these reasons, the Court holds that the balance of equities weigh in Vienna Metro's favor.

### D. The Specific Performance Order

The specific performance order below will conform to the guidelines under the Declaration. Under Virginia law, a specific performance must "'conform substantially to the contract made by the parties.'" Mem. Order at 20 (quoting *Eascalco, Inc. v. Caulfield*, 259 S.E.2d 821, 822 (Va. 1979)); *see Bissett Realty, Inc. v. Moyer*, 290 S.E.2d 851, 852 (Va. 1982). Although "the Court will not be forced to rewrite the contract, … it may supplement a contract's terms so long as it 'conforms substantially to the contract made by the parties.'" Mem. Order at 20. As shown below, the Order is a combination of the Declaration's established terms, as well as the terms agreed to by the parties.

## V. CONCLUSION

The Court will order specific performance because (1) specific performance is an appropriate remedy, (2) the Parties contractually agreed to this remedy, and (3) the balance of equities falls in Plaintiff's favor. For all of the above reasons, it is hereby

ORDERED that Pulte Home Corporation will complete its responsibilities under the Declaration within eighteen months of the date of this Opinion. The Court holds that eighteen months is commercially reasonable because Pulte explained that it could complete this project within twenty-two months. It is further

ORDERED that the Parties shall adhere to the following terms:

1.      Pulte is hereby directed to use its best efforts to perform its obligations in the Declaration, including without limitation each item of Pulte's Work described in Exhibit D to the Declaration. The Declaration shall be deemed incorporated into the Order as if fully set forth herein.

2.      Capitalized terms not defined in this Order shall have the same meaning as in the Declaration.

3.      For purposes of complying with this Order, Pulte's obligation to use "best efforts" shall mean (i) that time is of the essence for the completion of all of Pulte's remaining obligations under the Declaration, including without limitation the completion of each item of Pulte's Work; (ii) that Pulte shall complete each item of Pulte's Work as expeditiously as possible, without cessation of activities for reasons within its control or ability to abate; and (iii) that Pulte shall utilize all means and methods commercially available to meet the deadlines herein, including but not limited to working the maximum construction hours, including

weekends as permitted, that are commercially reasonable to complete each item of Pulte's Work as expeditiously as possible.

4.     The deadlines stated in the Declaration for Pulte's Work shall be reset as of the date of this Order. Absent a showing of good cause demonstrating that Pulte has been delayed by factors beyond its control or ability to abate, Pulte shall design, permit, bond and record all of Pulte's Work not later than twelve (12) months after the date of this Order and shall substantially complete and place in service all of Pulte's Work not later than eighteen (18) months after the date of this Order, which periods shall not be subject to extension under Section 1.11 of the Declaration (Force Majeure) or any other provision of the Declaration or Proffers. Disputes, if any, regarding delays to the completion of Pulte's Work as required by this Order shall be subject to review by the Special Master ("Master") as described in Paragraph 10 below.

5.     In complying with the requirements of the Declaration and this Order, Pulte shall ensure that all Pulte's Work fully complies with Exhibit D, Section 3(k) of the Declaration. Specifically, Pulte shall, prior to commencing any work, other than work already approved by Fairfax County (which includes the Vaden Drive Extended Plan, the Section 1 Plan, the Section 2 Plan, the Section 3 Plan, and all associated Fairfax County approved plan revisions), Pulte shall submit to Vienna Metro for its written approval the plan, specifications, schedules, and budgets relating to performance of Pulte's Post-Closing Obligations. All work shall be competitively bid to multiple contractors to minimize cost, and all work shall be performed in accordance with plans, specifications, budgets and schedules approved by Vienna Metro, as set forth in Exhibit D, Section 3(k) of the Declaration. Additionally, should Vienna Metro submit a proposed change to the submitted plan, and Pulte grants the change, the matter shall be deemed "approved," and Vienna Metro will not have another opportunity to reject the amended plan. For any work

undertaken by Pulte that Vienna Metro contends it has not approved, Vienna Metro shall have the right to submit to the Master, in accordance with Paragraph 10(d), any dispute (including cost allocation issues) relating to work Vienna Metro contends is unapproved.

6.      The restrictive covenant referenced in Section 2.1.1 of the Declaration shall not expire until forty-two (42) months after the last item of Pulte's Work has been substantially completed and placed in service.

7.      Within 10 days of the date of this Order, Pulte will submit to Fairfax County, and diligently seek the necessary approvals for, a revision to the Vaden Drive Extended Plan. This revision will implement the grading on the Clark Property, as shown on the plans submitted for approval by Pulte to Vienna Metro via a transmittal letter dated October 21, 2010 from Jeff Edelman to Jay Sotos entitled "re: Metro West, Vaden Drive Revision #3, Submission for Clark approval."

8.      In complying with the requirements of the Declaration and this Order, Pulte shall keep Vienna Metro fully informed of Pulte's progress with respect to performing its obligations in the Declaration. Pulte and Vienna Metro shall convene twice monthly, not later than the 5th and 20th days of each month, for a status conference until each element of Pulte's Work is substantially completed. Each side will submit to the other side an agenda item list of not more than five pages, single-spaced, with no more than seven (7) items to be discussed at the Conference. During the conference, the Parties will discuss each item of Pulte's Work that requires Vienna Metro's approval, work in progress, or remains incomplete, as well as: (i) each task that is still necessary to complete the item of Pulte's Work; (ii) Pulte's best estimate of when the item of Pulte's Work will be substantially complete; and (iii) any circumstances, including those beyond Pulte's control and ability to abate, that it believes in good faith may adversely

affect its ability to complete the item of Pulte's Work so that it will not delay Pulte's completion of all items of Pulte Work as required by this Order. In the event that Pulte believes that it will not be able to complete any item of Pulte Work within the time provided by this Order, the Parties shall discuss the factors causing the delay and Pulte's plan to avoid or mitigate the delay.

9. Pulte shall promptly provide a copy of this Order and the Declaration to (i) each Pulte project manager with responsibility for performing any of Pulte's obligations under the Declaration; (ii) each Pulte employee with responsibility for budgeting, allocating, or approving funds for the performance of Pulte's obligations under the Declaration; and (iii) each third party with responsibility for performing any aspect of Pulte's Work.

10. The Court finds that the "Decision Making Process" set forth in Exhibit D, Section 8 (a)-(d) of the Declaration has failed to produce timely agreements on matters that are necessary to the expeditious completion of Pulte's Work. Accordingly, the Court, pursuant to Federal Rule of Civil Procedure 53, appoints a Master to decide, on an expedited basis, all future disputed matters arising under Exhibit D, Section 3(k). The Master shall resolve the dispute, with all reasonable diligence and as expeditiously as possible, in accordance with the following procedures:

> (a) The Parties must each provide three names to the Court for potential Masters within five days of this Order. The written submission of Master nominees must include the candidate's resume. The Court is not bound by these recommendations.

> (b) The Master's authority shall include all matters related to MetroWest, including resolving matters described in paragraph (d) on which the Parties have not reached agreement within fourteen (14) days after the submission of

a request for approval or other action ("Consultation Period"). Prior to initiating review by the Master, Pulte shall provide Vienna Metro with a detailed estimate of the cost differential of the direction Vienna Metro wishes to pursue.

(c) At any time after the Consultation Period has expired, either party may initiate review by the Master by written notice to the other party and the Master. To initiate review, the complaining party shall submit a double-spaced, 14-point font report not exceeding ten pages providing (1) a simple, plain English description of the dispute (2) with a question or questions presented for disposition by the Master, (3) the relief sought, (3) the costs related to the dispute, (4) the impact of the development for both sides, (5) the impact on the construction schedule, and (6) how fast the proposed change can be implemented. The non-complaining party may submit a ten-page, double-spaced, 14-point font response up to three days after initiation of review. Each submission should attach a proposed order with a bulleted list of each item of relief sought with three boxes for checking: (1) "approved," (2) "disapproved," or (3) "approved as follows" with space for written modification. Except as the Master may determine in his or her discretion, neither party shall have the right to call witnesses or to cross-examine representatives of the other party. The Master shall have the right, at any time, to ask any questions, conduct any inspections, and request any and all documents and information he or she believes are needed (subject to all

applicable privileges) to resolve the matter in dispute, and each party shall provide such documents and information as expeditiously as possible.

(d) If the Master determines that (i) the item sought falls outside of the Declaration and approved plan for development, (ii) the disapproved matter affects the quality or functionality of the Clark Property; (iii) Vienna Metro is willing to pay the additional costs; and (iv) the direction provided by Vienna Metro does not have a material adverse effect on the Pulte Property that cannot be eliminated by allocating project costs among the parties, then the Master shall direct Pulte to proceed with the work as directed by Vienna Metro, and Master will allocate the incremental costs to Vienna Metro. For all issues relating to Pulte's Work under the Declaration where the Parties disagree, the Master shall decide the issue with a view toward adhering to the Declaration's terms and seeking to expedite the completion of the infrastructure work so that Vienna Metro may proceed with the project as soon as reasonably possible.

(e) The Parties and the Master shall meet every two weeks for a minimum of four hours, or less, or such amount of time as directed by the Master. Meetings will be held in the Judges' Conference Room at the United States District Court for the Eastern District of Virginia. The Master will be paid a minimum rate of five hundred dollars ($500) per hour for all time he expends working on this project. The Parties shall jointly share the Master's retainer of ten thousand dollars ($10,000), and shall pay the Master's fees on the first of each

month following the extinguishing of the retainer until the Declaration's terms are complete.

(f) The form in which the Master issues a ruling is at his discretion. He or she may either rule verbally following the hearing of the dispute, use the Proposed Orders submitted by the Parties, or may issue a written report and/or order resolving the dispute within 30 days. The Master's reports and/or orders shall be final, with no appeal to the Court, as stipulated by the Parties during the trial.

(g) The following exception shall apply. Vienna Metro shall produce to Pulte its current and good faith nonbinding draft of its preferred form of Umbrella Owners' Association (UOA) documents within 30 days of the date of this Order. If Vienna Metro and Pulte do not reach agreement on the terms of the UOA documents and do not have final, executed UOA documents within 45 days of the date of this Order, either party may submit the UOA dispute to the Master to be resolved in accordance with the time frames in this Notice.

(h) The Parties shall preserve all materials related to any and all proceedings, and the Parties shall hire a professional reporter to make a record of all proceedings involving the Master. Fed. R. Civ. P. 53(b)(2)(C).

The Clerk is directed to forward a copy of this Order to counsel of record.

ENTERED this 25th day of May, 2011.

Alexandria, Virginia

_____/s/_____
Gerald Bruce Lee
United States District Judge

31

COUNSEL OF RECORD:

Thomas Arthur Clare
Jeffrey Willian
Katherine Crytzer
Kirkland & Ellis
Counsel for Plaintiff Vienna Metro LLC
655 15th St NW
Suite 1200
Washington, DC 20005

Cathy Ann Hinger
Paul Kaplan
Elizabeth Warner Whip Grau
Jason Cameron Hicks
Counsel for Defendant Pulte Home Corporation
Womble Carlyle Sandridge & Rice PLLC (DC)
1401 Eye St NW
7th Floor
Washington, DC 20005