UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| VIENNA METRO LLC, ) | |
| ) | |
| *Plaintiff,* ) | |
| ) | |
| v. ) | Case No. 1:10CV502 |
| ) | GBL/TCB |
| PULTE HOME CORPORATRION, ) | |
| ) | |
| *Defendant.* ) | |

## DECLARATION OF CRAIG C. REILLY

I, CRAIG C. REILLY, being duly sworn, do hereby depose and state as follows:

1. I am over 21 years of age and otherwise competent to make this declaration. I have personal knowledge of the statements contained herein. The statements herein are true and correct to the best of my knowledge, information, and belief.

2. I am a member of the Virginia State Bar (VSB # 20942) and am admitted to practice before this Court.

3. I have been asked to serve as an expert for plaintiff, Vienna Metro LLC, in support of its application for an award of attorneys' fees and expenses. I have previously submitted a declaration in this case (Dkt. # 210). I am submitting this declaration to reply to contentions raised in the declarations submitted on behalf of the defendant, Pulte Home Corporation ("Pulte"), by Paul A. Kaplan, Cathy A. Hinger, Philip J. Harvey, and Bernard J. DiMuro (Dkt. ## 237 – 240).

**QUALIFICATIONS**

4. In addition to the qualifications I previously submitted, since the time of my previous declaration, I have served, and been found qualified by the trial court, as an expert in

the area of legal fees and hourly rates charged in Northern Virginia. *See Mantech Int'l Corp. v. Analex Corp.*, No. 2008-5845 (Fairfax Cir. June 10, 2011) (evidentiary hearing and final order). In that case, the defendant (by whom I was retained) sought fees and expenses as a sanction against the plaintiff, who abruptly took a nonsuit in the middle of a two-week theft of trade secrets trial. After both a direct examination about my qualifications and *voir dire* by plaintiff's counsel, the trial court ruled that I was qualified as an expert. Based on my testimony and opinions, the trial court then specifically ruled that the legal fees sought by the defendant (in excess of $1.5 million) and the hourly rates applied (*e.g.*, 25-year partner: $625; third-year associate: $325) were "reasonable." However, the trial court ultimately ruled that the imposition of sanctions was not appropriate.

### FIRMS WHO "COULD HAVE HANDLED THE REPRESENTATION"

5. In his declaration, Mr. DiMuro opined that there were several other firms in Northern Virginia which "could have handled the representation of [plaintiff, Vienna Metro LLC]" at lower hourly rates (Dkt. # 240, *DiMuro Decl.* ¶¶ 12-14). The firms selected by Mr. DiMuro, in my opinion, possess neither the skills and expertise nor the capacities comparable to those of the firms that the parties actually selected as their advocates:

*DiMuroGinsburg P.C.:* Mr. DiMuro's firm has six partners, four associates, and three "of counsel" attorneys. The partners advertize such specialties as criminal defense, ADA, labor and employment, and "civil litigation." None specialize in real estate litigation.[1]

---

[1] Information referenced herein is from each firm's Martindale Hubbell profile or the firm's website—both of which are prepared by the firms themselves. In addition, I know and have worked with lawyers at all of those firms, which experience confirms the accuracy of the firms' own descriptions of themselves. I respectfully submit that the Court should look to this information, instead of Mr. DiMuro's conclusory assertion, to determine whether these really are comparable firms capable of handling this case. I submit that they are not.

*Stites Harbison, PLLC:*  The Alexandria office of this firm has eight partners, seven of whom practice exclusively in intellectual property law.  There are only two litigators (one partner and one associate) who even practice "civil litigation," and they are recent lateral-hires.  Neither proclaims a specialty in real estate litigation.

*Moore & Lee, LLP:*  This boutique firm has six partners, six associates, and two "of counsel" attorneys.  It promotes itself as having vast experience "in government contracts and construction law," and currently specializes in "negotiating, counseling, and litigating disputes on large construction projects in federal and state courts."  In my experience, having also practiced "construction law" in Northern Virginia, these attorneys represent bond companies, contractors, sub-contractors, materialmen, and suppliers who are litigating between themselves, or with the project owner, over payment and performance issues under the federal Miller Act, under construction bonds, or under Virginia's mechanic's lien statutes.  That is different from the "real estate litigation" involved here, where the parties, who have entered into a contract for the development of a parcel, are litigating over the contractual duty of one of them (Pulte) to proceed with the infrastructure work and what remedies would be available for a breach.

*Rees Broome, PC:*  This is an excellent, mid-sized firm that offers a variety of legal services, featuring transactional practices in "community association" law, "corporate and general business," "estate planning and wealth management," "tax," "banking," "employment" law, and other transactional practice areas.  In addition, the firm states it has a litigation capacity in such areas as "civil litigation," "engineering malpractice," and other specialty areas.  One of the firm's senior litigators and a litigation associate, however, recently left to join Stites Harbison (see above).

***Smith Pachter & McWhorter PLC:*** This is a boutique firm specializing in government contracting and construction law. Neither real estate law nor real estate litigation of the sort at issue here is within the ambit of this firm's core practice.

***Watt, Tieder, Hoffar & Fitzgerald, LLP:*** This is a premier firm offering "worldwide" legal services in narrowly focused practice areas: "construction" and "surety" law, "government contracts," "real estate and commercial transactions," and "insolvency." Much like the Moore & Lee boutique, this firm's litigation focus is on contractor performance bond issues, rather than real estate litigation of the sort at issue here.

***Bean Kinney & Korman:*** This firm markets itself as a "full service" local firm offering a wide variety of legal services—from divorces, taxes, trusts and estates, mergers and acquisitions, personal injury, business formations, land use, and many, many others—in addition to civil litigation. The firm's litigation practice also is diverse, including (in its own words) "commercial contract litigation, partnership disputes, employment matters, title disputes and title insurance claims defense, credit enforcement, bankruptcy adversary proceedings, lender liability claims, leasing disputes, airline agency collections, construction claims, and business accountings"—but not real estate litigation.

***Odin Feldman Pittleman, P.C.:*** This is a mid-sized (about 50 lawyers), local, full-service firm, which includes a substantial real estate law practice (transactional and litigation). The litigators at this firm have excellent reputations, but in my opinion are not on a par with either firm actually selected by the parties in this case in terms of skill, reputation, experience with complex litigation, or capacity for handling a complex case like this one.

6. In my previous declaration, I explained why I surveyed the hourly rates of certain firms who were on a par with the firms actually selected by the parties, and who were capable of

4

handling this case on a par with those firms (Dkt. # 210, *Reilly Decl*. ¶¶ 9-15). I stand by my analysis, and submit that I used proper methodologies, developed complete, accurate, and current information, and reached well reasoned and factually supported conclusions. After analyzing the profiles, reputations, and capabilities of the firms selected by Mr. DiMuro, it is obvious that they were not selected by any consistent and coherent criteria—other than lower hourly rates. As importantly, the litigants in this case (large, national companies) ***did not*** choose firms like the ones selected by Mr. DiMuro. In my opinion, those firms are not comparable to the firms selected by the parties and do not have the skills, experience, and capacities to have successfully handled this case.[2]

## PREVAILING HOURLY RATES

7. Mr. DiMuro uses only the firms he selected as the basis for his conclusory assertion of the "prevailing hourly rate" (*Id*., ¶¶ 13-16). Even assuming that any or all of those firms fit into the "could have handled the representation" category (which I do not concede), the firms I surveyed also would have to be included when calculating the prevailing rates of firms which "could have" handled the case. The inclusion of rates from all the firms—big and small— would result in a much higher rate than that calculated by Mr. DiMuro based on his skewed

---

[2] I take exception to Pulte's grossly mistaken arguments that somehow District of Columbia rates "corrupted" my survey, and that the firms I surveyed did not provide rates for complex real estate litigation (Dkt. # 236, *Pulte Br. Opp*. at 18-19 & n.19). As I made clear in my previous declaration, I specifically asked for rates for "this sort of litigation"—that is "complex real estate litigation" in Northern Virginia—which I then provided to the Court in my declaration (Dkt. # 210, *Reilly Decl.* ¶¶ 9-13). No one can doubt that firms like McGuire Woods, Reed Smith, Venable, and Hogan Lovells routinely handle complex real estate litigation in Northern Virginia. And although some (but not all) firms responded that some of the litigators who might have been assigned to this sort of case were not necessarily located in the firm's Northern Virginia office, as I made clear, "Regardless of office locations, however, ***the fees reported are those for litigators who would staff complex real litigation in Northern Virginia***" (*Id*., n.1) (emphasis added). Indeed, many of those firms have Virginia licensed lawyers resident in their District of Columbia offices who regularly litigate complex real estate litigation in Northern Virginia.

5

selection of only firms with low rates. Indeed, in his quest to suppress the value of the prevailing hourly rates, Mr. DiMuro opines that the applicable partner rate ($400-$425) is *lower* than the rate he charges per hour ($450) and *much lower* than that which Pulte's lead lawyer charges ($525-$550). Such result-oriented reasoning cannot be credited. Following Pulte's methodology, therefore, results in artificially low values, which do not represent the "prevailing hourly rates."

8. Moreover, the Supreme Court has recognized that determining a "prevailing market rate" is "inherently difficult" and in any event an artificial construct because lawyers are not "commodities," and hourly rates are not determined by "supply and demand" for fungible products and services.[3] Instead, hourly rates "vary widely," based on "experience, skill, and reputation" of the lawyer—including variations within a law firm.[4] That certainly is true for hourly rates charged by large firms for complex real estate litigation. (Dkt. # 210, *Reilly Decl.* ¶¶ 9-13). For this reason, in my opinion, stating the prevailing rate as a range is more accurate than as a single figure.

9. Furthermore, the Supreme Court recognized that hourly rates privately negotiated for civil litigation differ from the rates that may be used under the federal fee-shifting statutes.[5] In private civil litigation, the lawyer's "customary" hourly rate is used, not the artificial construct of a "prevailing market rate."[6] Thus, under the federal fee-shifting statutes, the "prevailing market rate" for civil rights litigation will be inherently lower than the actual market rate for complex litigation services (in which the lawyer's skill, experience, and reputation will justify a

---

[3] *See Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984).

[4] *Id*.

[5] *Id*.

[6] *Id*.

6

higher rate), and may be lower (even much lower) than the lawyer's "customary" hourly rate. Pulte's methodology ignores the Supreme Court's reasoning, the nuances of its analysis, and the distinction drawn between federal fee-shifting statutes and fees for complex civil litigation between private parties (which are at issue here), and proposes that the "prevailing market rate" be calculated based on the lowest billing rates charged by firms who are arguably capable of providing similar services. That is not the proper test under Virginia law.[7]

### BLOCK BILLING AND QUARTER-HOUR INCREMENTS

10. Pulte's experts strongly condemn the practice of so-called "block billing" (Dkt. # 239, *Harvey Decl*. ¶ 18; Dkt. # 240, *DiMuro Decl*. ¶ 19). But as courts generally have noted, "while block billing might not provide the best possible description of hours sought, it is not a wholesale prohibited practice."[8] The Supreme Court does not prohibit block billing generally, nor require task-by-task allocations of time for its own sake; rather, the purpose of requiring the fee applicant to submit reasonably accurate and descriptive time records is simply to allow the trial court to identify and exclude work on "distinct claims" on which the applicant did not

---

[7] When fees are awarded under a contract provision governed by Virginia law, the following factors are considered: "[1] the time and effort expended by the attorney, [2] the nature of the services rendered, [3] the complexity of the services, [4] the value of the services to the client, [5] the results obtained, [6] whether the fees incurred were consistent with those generally charged for similar services, and [7] whether the services were necessary and appropriate." *Chawla v. BurgerBusters, Inc.*, 255 Va. 616, 623, 499 S.E.2d 829, 833 (1998) (citations omitted). Thus, the fees need not be the lowest charged in the market, but must be "consistent with those generally charged for similar services." In my survey, I limited my selection of firms to those who provide "similar services"—complex real estate litigation—in the Northern Virginia market. Likewise, under the federal fee-shifting statutes, the aim is to ensure that "the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." *Blum v. Stenson,* 465 U.S. at 895 n.11. Neither analysis requires that the lowest possible billing rate be found and applied.

[8] *United States ex rel. McKay v. Touchstone Research Labs., Ltd*., 2009 U.S. Dist. LEXIS 90779, *9-10 (S.D. Ohio Sept. 3, 2009).

7

prevail.[9] Counsel for the prevailing party, therefore, "is not required to record in great detail how each minute of his time was expended," but need only "identify the general subject matter of his time expenditures."[10] If the applicant's time records, even if in block billing format, are sufficient to permit the trial court to identify and eliminate non-compensable work, then the time records are sufficient.[11]

11. Here, Pulte's experts do not identify any particular time records in which legal work on both compensable and non-compensable tasks were comingled. Instead, they merely make a generalized criticism of block billing as if it were prohibited *per se*, which it is not.

12. Mr. DiMuro opines that billing in one-tenth-of-an-hour increments is now "standard" (Dkt. 240, *DiMuro Decl*. ¶ 20). I am not aware of any legal or ethical standard requiring billing in one-tenth increments, nor does Mr. DiMuro cite any support for his assertion. To be sure, billing in one-tenth increments may be commonly, even widely, practiced by law firms, but it is neither the "standard" practice nor a required one.

13. Billing in quarter-hour increments has been criticized by courts as potentially inflating recorded time for tasks that can be accomplished in a period of time shorter than fifteen minutes. But that criticism only holds water for isolated, short-duration tasks—such as a five-minute telephone call that is the lone time entry for an entire day, but which is then recorded as one-quarter hour. However, if an attorney works for three hours and twelve minutes writing a brief, the recordation of 3.25 hours will not be materially different than the recordation of 3.2 hours. Similarly, if an attorney works for three hours and thirty minutes on a project, the time recorded is the same under either billing practice (3.5). Thus, when the time periods of work are

---

[9] *Hensley v. Eckerhart*, 461 U.S. 424, 437 & n.12 (1983).

[10] *Id*. at 437 n.12.

[11] *McKay v. Touchstone*, *supra*, at *10.

8

longer, the use of quarter-hour increments might inflate the recorded time only marginally—if at all. Hence, other courts have made a marginal deduction for quarter-hour billing (*e.g.*, 5%)[12] not the more drastic deductions Pulte's experts have proposed.

### TIME REASONABLY AND NECESSARILY EXPENDED

14. Both Mr. Harvey and Mr. DiMuro apply hindsight and excessively strict criticism to assail the reasonableness and necessity of the time expended. The reasonableness and necessity of legal work must be assessed in real time as the case is unfolding. Here, for example, both experts point to the summary judgment rulings in favor of Vienna Metro LLC as having dramatically simplified the case. Those rulings did indeed simplify the case, but those favorable summary judgment rulings did not undermine the reasonableness and necessity of all the work that contributed to those results—if anything, it *confirmed* the reasonableness and necessity of all that work.

15. Mr. Harvey, for example, contends that the fees incurred by Vienna Metro LLC "shock the conscience," are "exorbitant," and "patently excessive" (Dkt. # 239, *Harvey Decl*. ¶¶ 7, 9 & 18). There is hardly a task with which he does not find to have been the result of "over litigating" the case. Mr. Harvey's overstated (and overheated) criticisms fall of their own weight.

16. Likewise, Mr. DiMuro opines that "the damages claims brought by the Kirkland Law Firm were tenuous at best and a reasonably skilled and prudent Virginia practitioner would have recognized that to be the case from the outset" (Dkt. # 240, *DiMuro Decl*. ¶¶ 18 – 21). However, if Mr. DiMuro's analysis were applied to his own client, Pulte, then it could as rightly be said that Pulte's counsel should have realized that the defense of this case on the merits was

---

[12] *Board of Education v. I.S.*, 358 F. Supp. 2d 462, 470 (D. Md. 2005) (5% reduction)..

9

"tenuous at best and a reasonably skilled and prudent Virginia practitioner would have recognized that to be the case from the outset." Instead of conceding liability "at the outset," however, Pulte's counsel vigorously defended the case, initiated extensive and costly discovery, and asserted numerous meritless affirmative defenses, requiring that Vienna Metro LLC vigorously pursue its rights through extraordinarily expensive litigation to final judgment. Having chosen not only to invite litigation by its refusal to perform its contractual duties, but then to make the litigation more complicated and more contentious, Pulte should not be heard now to complain that the fees incurred by his opponent are "unreasonable."[13] The standard is reasonableness at the time the work was rendered, when Pulte was vigorously litigating on every front.

17.     Mr. Kaplan's calculation of the "reasonable" fee is telling (Dkt. # 237, *Kaplan Decl.* ¶ 65). In his opinion, the reasonable fee is about $1 million. That is, no doubt, ***far less*** than his firm billed to Pulte (an amount he is careful not to disclose other than to suggest that it is less than the fees billed to Vienna Metro LLC). Indeed, the rates he suggests are appropriate for Vienna Metro LLC's lead attorneys ($400-425 per hour) are far less than his own rates ($525-$550 per hour).[14] Moreover, this calculation is revealing of Pulte's motivations. It readily appears from the record, that Pulte long ago determined that it would be cheaper to breach, litigate, lose, and pay Vienna Metro LLC's fees, than to timely perform the contract. Now, in the

---

[13] *See Virginia Academy of Clinical Psychologists v. Blue Shield of Virginia*, 543 F. Supp. 126, 134 (E.D. Va. 1982) (defendant who has "pull[ed] out all the stops … may not complain to the Court about the hours plaintiffs naturally expended in response" to defendant's litigation tactics).

[14] I also note that in its June 28, 2011 Order, the Court opined that "the Parties have likely incurred over $10 million in attorney's fees over the last four years." (Dkt. # 230, June 28, 2011 Order at 2.) And that Special Master "Judge Sheridan's $700 hourly rate mirrors the rates of the senior attorneys in this case" and "should be commensurate with the attorneys retained in this case, and viewed in light of the project's overall cost." (*Id.*)

final throes of the case, Pulte is trying to realize the illegitimate benefit of its breach by minimizing the fees it has to pay. That, of course, would be grossly unjust and inequitable.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: July 15, 2011            /s/ Craig C. Reilly
                                Craig C. Reilly VSB # 20942
                                111 Oronoco Street
                                Alexandria, Virginia 22314
                                TEL:   (703) 549-5354
                                FAX:   (703) 549-2604
                                EMAIL: craig.reilly@ccreillylaw.com

## CERTIFICATE OF SERVICE

 I hereby certify that on the 15th day of July, 2011, I served the Declaration of Craig C. Reilly via the Court's CM/ECF filing system to the following:

 Paul A. Kaplan
 Cathy A. Hinger (VA Bar No. 46293)
 Elizabeth W. Grau (VA Bar No. 74935)
 WOMBLE CARLYLE SANDRIDGE & RICE, PLLC
 1401 Eye Street, N.W., Seventh Floor
 Washington, DC 20005
 Telephone: 202-467-6900
 Facsimile: 202-467-6910

            *s/ Thomas A. Clare, P.C.*
            Thomas A. Clare, P.C. (Va. Bar No. 39299)
            KIRKLAND & ELLIS LLP
            655 Fifteenth Street, N.W., Suite 1200
            Washington, D.C. 20005
            Telephone: (202) 879-5000
            Facsimile: (202) 879-5200
            tclare@kirkland.com